Robert **SPURLOCK** and Ronnie Marshall, Plaintiffs–Appellees,

v.

Danny **SATTERFIELD**, Defendant–Appellant,

Lawrence Ray Whitley; Jerry R. Kitchen; John D. Coarsey; Henry Apple; Sumner County, Tennessee; City of Hendersonville, Tennessee, Defendants.

No. 97–6076.

United States Court of Appeals, Sixth Circuit.

Argued July 30, 1998.

Decided Feb. 11, 1999.

---

Andrew B. Campbell (argued and briefed), J. Graham Matherne (briefed), Wyatt, Tarrant, Combs, Gilbert & Milom, Nashville, Tennessee, for Defendants–Appellants.

Rick Halprin (argued and submitted), Chicago, Illinois, Nathan Diamond–Falk (briefed), Chicago, Illinois, George Whitney Kemper, Hendersonville, Tennessee, Judith A. Halprin (briefed), Highland Park, Illinois, for Plaintiffs–Appellees.

Before: JONES, RYAN, and MOORE, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant, Danny Satterfield, a Deputy with the Sumner County Sheriff's Department ("S.C.S.D."), appeals the district court's order denying his motion to dismiss based on absolute or qualified immunity. Plaintiffs–Appellees, Robert Spurlock and Ronnie Marshall, alleged that Satterfield committed various acts that violated their constitutional and/or statutory rights. For the reasons stated herein, we find that Satterfield is not entitled to either absolute or qualified immunity for these alleged actions, and affirm the district court's decision.

## I.

On February 21, 1989, the body of Lonnie Malone was found in a culvert of Bug Hollow Road in Sumner County, Tennessee.[1] Malone had died as a result of multiple stab wounds. According to Spurlock and Marshall, Satterfield and other S.C.S.D. law enforcement officials immediately focused the

---

1. This appeal is before this court pursuant to defendant's motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6). Thus, defendant may not challenge the facts alleged by plaintiffs in their complaint. *See Sistrunk v. City of Strongsville,* 99 F.3d 194, 197 (6th Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997). The facts stated herein are primarily taken from plaintiffs' Second Amended Complaint. In addition, many of the following facts are discussed in detail in *State v. Spurlock,* 874 S.W.2d 602 (Tenn.Crim.App.1993), Spurlock's second criminal trial.

investigation into the murder upon them.[2] Spurlock alleges that although S.C.S.D. officers obtained a search warrant for his home and automobile on the following day, no evidence was discovered linking him to the crime. He contends that even though he provided the officers with an alibi and alibi witnesses, the officers failed to investigate his claims and refused his offer to take a polygraph test. Further, during the investigation, officers discovered a significant amount of evidence linking others to the Malone murder, but ignored it.[3] Subsequently, defendant Lawrence Ray Whitley, Sumner County District Attorney, announced that a reward was being offered to any individual who could provide information leading to the arrest or conviction of any individual involved in the Malone murder.

## A. April 27, 1990 Events

Spurlock and Marshall contend that defendant John Coarsey, a Hendersonville, Tennessee police officer, learned of the reward and devised a scheme to obtain the reward money. To effectuate this scheme, Coarsey claimed to have received information concerning the crime from an informant, defendant Henry Apple, who at that time was incarcerated in the Sumner County jail for failure to pay child support. According to plaintiffs, Coarsey knew Apple to be a "drug user" and "street informant." Shortly thereafter, Coarsey contacted Satterfield, and the two went to the county jail in order to interrogate Apple about the Malone homicide. Spurlock contends that when Apple was initially confronted, he denied any knowledge of the crime, but through pressure, threats of prosecution, and the defendants' promises to help Apple and his family, Apple agreed to implicate Spurlock and Marshall for the Ma-

lone murder. Coarsey also allegedly told Apple that if he would implicate Spurlock and Marshall, the District Attorney General would secure his release from the county jail. According to plaintiffs, Apple had no knowledge of the details of the crime. Thus, in order for Apple to effectively pose as an informant, Coarsey and Satterfield then allegedly informed Apple of all of the information he needed concerning the details of the crime.

Subsequently, Coarsey and Satterfield contacted defendant Whitley and informed him that they had coerced Apple into falsely implicating Spurlock and Marshall for the Malone murder. Whitley then met with Apple at the jail, and allegedly assured Apple of his release in exchange for falsely implicating Spurlock and Marshall. According to plaintiffs, later that day, Whitley, Satterfield and Coarsey, after assuring themselves that Apple "had his story straight," arranged a videotaped interview with Apple concerning the crime.[4] After viewing the tape, however, the defendants were not satisfied, and Whitley directed Satterfield to place more pressure on Apple to make false statements concerning the crime, including a statement that he had actually seen the killing.[5] Satterfield and other defendants also allegedly told Apple that if he would say that he actually saw the killing, he would be entitled to receive the reward money. Plaintiffs further allege that in other portions of this April 27, 1990 videotape Apple spoke with Whitley, in the presence of Satterfield, about the possibility of immediate release. Despite the defendants' promises to secure his immediate release, as of April 29, 1990, Apple was still incarcerated in the Sumner County jail. Apple became concerned that Whitley would renege on his promises to secure his release

**2.** Apparently, some officers theorized that Marshall and Malone sold drugs for Spurlock, and that Spurlock decided to kill Malone for failing to pay for drugs that he had supplied to Malone. *See id.* at 605.

**3.** In May and April 1989, S.C.S.D. officers interviewed numerous witnesses, some of whom identified Robert Thomas Coats as the individual who killed Malone or participated in the murder. In addition, Coats admitted to one of these witnesses that he killed Malone. However, the

prosecutor did not provide this exculpatory evidence to the defense. *See id.* at 606–08.

**4.** Plaintiffs also allege that Coarsey made an audio tape with Apple prior to making the video tape.

**5.** Plaintiffs allege that defendants originally told Apple to falsely state that he saw Spurlock with blood on his shirt the night of the murder, and that he heard screams in the distance before seeing Spurlock.

in exchange for falsely implicating Spurlock and Marshall. Thus, Apple discussed his concerns with a guard at the jail, who recorded the conversation.

### B. April 30, 1997 Events

Satterfield and other defendants became aware of Apple's concerns, and ultimately decided not to induce Apple to falsely assert that he had actually seen the killing. Instead, the defendants decided to create a second videotape in order to conceal the prior recorded conversations. In this second tape, recorded on April 30, 1990, Apple was to state that that date was the first time that he had spoken with law enforcement officials concerning his knowledge of the Malone murder. After making the second tape recorded conversation of his alleged knowledge of the Malone murder, Apple was released from jail.

### C. Criminal Trials of Spurlock and Marshall

On May 9, 1990, Whitley and defendant Assistant District Attorney Jerry Kitchen presented Apple's statements to a Sumner County grand jury, which then indicted Spurlock and Marshall for the first degree murder of Malone. According to Spurlock and Marshall, in order to ensure that they would be convicted, Whitley and Kitchen also threatened Priscilla Blakemore[6] with criminal prosecution if she did not falsely state that she had seen Marshall on the night of the murder with mud all over his clothes, and that he had "confessed" to her that night.

On September 27, 1990, a jury convicted Marshall of first degree murder. On October 17, 1990, a jury also convicted Spurlock of first degree murder. Both Spurlock and Marshall were subsequently sentenced to life in prison. Thereafter, they both filed post-trial motions seeking new trials and alleging prosecutorial misconduct and violations of their constitutional rights. Plaintiffs claim that while their appeals were pending, Satterfield and other "conspirators" attempted

to prevent them from receiving new trials by doing such things as giving "hush" money to Apple in order to ensure his continuing silence concerning the previous events. Marshall's motion for a new trial was denied on November 6, 1990 and Spurlock's motion was denied on January 11, 1991.[7]

Despite the defendants' efforts, Marshall eventually won his appeal and was granted a new trial on December 1, 1992. *See State v. Marshall,* 845 S.W.2d 228 (Tenn.Crim.App. 1992). In May 1993, Spurlock's conviction was reversed and remanded and a new trial was ordered. *See Spurlock,* 874 S.W.2d at 620–22 (holding that the prosecution had unconstitutionally suppressed exculpatory evidence, including the April 27, 1990 tape recorded conversation between Apple, Coarsey and Whitley). The court also held that Whitley unconstitutionally elicited false testimony from Satterfield and Apple at trial. *Id.* The court further concluded that Satterfield falsely testified when, during his direct examination, he replied that no promises had been made to Apple and that the April 30 interview was the first time that Apple had made any statements concerning the crime. *Id.*

For Spurlock's second murder trial, Whitley recused himself as prosecutor, allegedly in order to bolster Apple's credibility. In January 1995, Apple and Whitley falsely testified against Spurlock. Plaintiffs claim that as a result of this false testimony, Spurlock was convicted of second degree murder and subsequently sentenced to twenty years' imprisonment. Spurlock's subsequent motions for a new trial were denied, and Spurlock once again appealed his conviction and sentence.

Thereafter, Whitley was busy at work in Marshall's case. Whitley offered Marshall a "best interest plea" in which Marshall would not have to admit guilt for the Malone murder. In return, Marshall would receive a ten year probationary sentence. According to plaintiffs, "Marshall acquiesced in the offer in order to avoid again being convicted on false testimony and incarcerated." Second

---

6. Blakemore is not a defendant in this action.

7. Spurlock claims that, pursuant to his motion, he presented the district court with evidence of

the suppressed video and audio tapes from April 1990, along with other suppressed evidence.

Amended Complaint, at ¶ 25. Consequently, Marshall was sentenced to an alternative ten year sentence, which would end in the year 2005.

During the period of Spurlock's appeal and Marshall's sentence, Bob Baker, a Lieutenant with the S.C.S.D., conducted a new investigation into the Malone murder and obtained information linking other individuals to the crime. As a result of this investigation, these other individuals confessed to the Malone murder. On March 6, 1996, Spurlock's and Marshall's convictions were again vacated and new trials ordered.

### D. Civil Actions

On October 9, 1996, Spurlock and Marshall filed separate complaints in federal district court asserting claims under 42 U.S.C. §§ 1981, 1983 and 1988 and the United States Constitution.[8] Spurlock and Marshall also brought pendent state law malicious prosecution claims. The cases were subsequently consolidated, and plaintiffs filed a Consolidated Amended Complaint on March 5, 1997. J.A. at 72.[9] On January 28, 1997, Satterfield filed a motion to dismiss the complaint in its entirety pursuant to Rule 12(b)(6), asserting absolute and qualified immunity. The other defendants filed similar motions. Later, after Spurlock and Marshall amended their complaints a second time, additional motions to dismiss were filed. On July 17, 1997, the district court granted in part, and denied in part, the motions to dismiss.[10] With regard specifically to Satterfield, the district court found that Satterfield was entitled to absolute testimonial immunity for his testimony provided as a witness in Spurlock's criminal trial, but not for his alleged non-testimonial acts. The district court did not address Satterfield's claim of

qualified immunity for his non-testimonial acts, finding that Satterfield had failed to address the issue in his motion to dismiss. Satterfield thereafter filed this timely appeal.[11]

### II. Standard of Review

The issues before us on appeal were addressed in the district court's denial of defendant's motion to dismiss for plaintiffs' failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). The district court's ruling on a Rule 12(b)(6) motion to dismiss is a question of law subject to *de novo* review. *See Sistrunk,* 99 F.3d at 197; *Bower v. Federal Express Corp.,* 96 F.3d 200, 203 (6th Cir.1996). In considering the defendant's motion, we must " 'construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein.' " *Sistrunk,* 99 F.3d at 197 (quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994)). We will grant defendant's motion " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998). We review the district court's denial of defendant's claims that he is entitled to absolute or qualified immunity *de novo,* as that issue is a question of law. *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996). In reviewing immunity defenses, we determine whether the facts alleged by plaintiffs, if proved, would overcome the asserted defenses. *See Bloch,* 156 F.3d at 677.

### III. Absolute Immunity

On appeal, Satterfield argues that the district court erred by failing to grant him

---

8. The complaint named the following as defendants: Whitley; Kitchen; Coarsey; Satterfield; Apple; Sumner County Sheriff, Richard Sutton; Hendersonville Chief of Police, David Key; Sumner County, Tennessee; and the City of Hendersonville, Tennessee.

9. This consolidated complaint specifically alleged violations of plaintiffs' rights under the First, Sixth and Fourteenth Amendments. J.A. at 72. In addition, Sutton and Key were not named as defendants in this consolidated complaint.

10. The initial complaint did not claim a Fourth Amendment violation. That allegation was added pursuant to the district court's order allowing plaintiffs to file a Second Amended Complaint adding that claim.

11. The court addressed the other defendants' motions to dismiss in its memorandum opinion, and those defendants also appealed; however, their appeals are not currently before us.

absolute immunity for *all* of the acts alleged in plaintiffs' complaint. He contends that conspiracy to render false testimony, as well as giving false testimony at trial, is protected by absolute immunity for witness testimony. He further argues that plaintiffs' attempt to separate various acts of the alleged conspiracy into testimonial and non-testimonial events is meaningless, because the only act that could be considered injurious would be the allegedly false testimony rendered by Satterfield and Apple, which was protected by absolute immunity. In essence then, he contends that the non-testimonial acts of the conspiracy cannot be maintained because none of these alleged acts, standing alone, have caused any injuries or violated plaintiffs' constitutional rights.

The plaintiffs concede that any testimony that Satterfield provided as a witness during Spurlock's trial would indeed be protected by absolute immunity. They contend, however, that the defendant is "arguing the wrong case," because the actions alleged here, such as giving Apple manufactured physical evidence, threatening retaliation if Apple did not falsely testify, and manufacturing probable cause evidence, are non-testimonial in nature and cannot be immunized simply because the false testimony given by Satterfield, Apple and other defendants was covered by absolute immunity. They also point out that the conspiracy to convict them for a murder that they did not commit persisted even after Satterfield and other defendants had given this false testimony.

### A. Witness Testimony

We find Spurlock's and Marshall's arguments to be well-taken. The issue here is not simply one of providing false testimony at trial, or even, for that matter, conspiring to give false testimony. It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings. *See Briscoe v. LaHue,* 460 U.S. 325, 330–31, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Thus, it is clear that Satterfield would be insulated from liability for any testimony that he provided as a witness at trial, no matter how egregious or perjurious that testimony was alleged to have

been. Accordingly, the district court correctly found that Satterfield was absolutely immune from suit for his testimony during Spurlock's criminal trial, and we easily affirm the district court's conclusion in that regard. Moreover, we note also that the mere fact that plaintiffs may allege a conspiracy to render false testimony, as opposed to simply alleging that one person testified falsely at trial, does not waive absolute testimonial immunity. *See Alioto v. City of Shively, Kentucky,* 835 F.2d 1173, 1174–75 (6th Cir.1987); *Macko v. Byron,* 760 F.2d 95, 97 (6th Cir. 1985). Thus, Satterfield is correct that an alleged conspiracy to provide false testimony does not abrogate his right to absolute testimonial immunity.

For the following reasons, however, we conclude that the district court correctly determined that this was the only situation in which absolute immunity should be granted to Satterfield. The simple fact that acts may ultimately lead to witness testimony does not serve to cloak these actions with absolute testimonial immunity. *See Buckley v. Fitzsimmons,* 20 F.3d 789, 796 (7th Cir.1994)("constitutional wrongs completed out of court are actionable even if they lead to immunized acts"); Douglas J. McNamara, *Buckley, Imbler and Stare Decisis: The Present Predicament of Prosecutorial Immunity and an End to its Absolute Means,* 59 Alb. L. Rev. 1135, 1193 (1996) (noting that "the funneling of fabricated evidence through a witness with absolute defamation immunity should not filter out liability for causing the continued incarceration of an innocent person"). The Eleventh Circuit recently held that absolute testimonial immunity does not "relate backwards" to "protect [a defendant] for any activities he allegedly engaged in prior to taking the witness stand for his grand jury testimony." *Mastroianni v. Bowers,* 160 F.3d 671, 677 (11th Cir.1998)(denying defendant's motions for summary judgment based on absolute and qualified immunity). We agree with the Eleventh Circuit's resolution of this issue. Moreover, we believe that the non-testimonial acts alleged here are akin to a situation in which a prosecutor commits unlawful acts prior to her role as an advocate, and is therefore not entitled to absolute prosecutorial immunity. *See,*

*e.g., Pena v. Mattox,* 84 F.3d 894, 897 (7th Cir.1996); *Buckley,* 20 F.3d at 794 (holding that a prosecutor would not have absolute immunity for interrogation of, and payments to, witnesses who falsely testified at a criminal trial because he was not functioning as an advocate before he had probable cause to have anyone arrested). Similarly, here, the fact that Satterfield's alleged non-testimonial actions served to pressure and coerce Apple into testifying falsely, and ultimately resulted in an absolutely immunized action-Apple's false testimony-does not make those underlying actions covered by absolute immunity.

### B. Non–Testimonial Acts

In addition to presenting false testimony at Spurlock's trial, plaintiffs also allege that Satterfield committed the following acts:

> Persuading Defendant Apple to lie, and supplying Apple with the necessary details of the homicide. [Second Amended Complaint, at ¶¶ 15, 16].
>
> Attempting to persuade Defendant Apple to say he actually witnessed the Malone homicide, and offering Apple the reward money if he would do so. [*Id.* at ¶¶ 15–17].
>
> Creating a tape recording on April 30, 1990 in an effort to conceal the events of April 27 and April 29, 1990. [*Id.* at ¶ 19].
>
> Giving Defendant Apple 'hush money' after Plaintiffs' first trials, in order to induce his continued silence and cooperation. [*Id.* at ¶ 43].

See J.A. at 162. Satterfield ignores the fact that plaintiffs allege that he engaged in testimonial *and* non-testimonial acts that occurred both before and after he and other defendants rendered false testimony at trial. Thus, Satterfield's argument misses the point, for plaintiffs do not merely allege that Satterfield gave false testimony and conspired to present false testimony, but also that he committed, and conspired to commit, non-testimonial acts, such as manufacturing

probable cause and fabricating evidence. It is for these alleged violations that we conclude that Satterfield is not entitled to absolute immunity.

 In support of his plea for absolute immunity, Satterfield relies on this court's decision in *Alioto.*[12] He also points to decisions by other circuits. *See, e.g., Pinaud v. County of Suffolk,* 52 F.3d, 1139, 1148 (2d Cir.1995)("when the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy") (citation and quotation marks omitted); *Snelling v. Westhoff,* 972 F.2d 199, 200 (8th Cir.1992)(per curiam); *House v. Belford,* 956 F.2d 711, 720–21 (7th Cir.1992). Satterfield's reliance on those cases is misplaced. In *Alioto,* Neil Alioto, a police officer, was indicted for falsely swearing and tampering with evidence. *Alioto,* 835 F.2d at 1174. Several public officials appeared as witnesses before the grand jury investigating him. After a jury trial, however, Alioto was found not guilty of the charges against him. *Id.* He then brought a § 1983 action against the officials, asserting that the doctrine of absolute witness immunity was inapplicable because the defendants conspired to give incomplete and false testimony to the grand jury, and the conspiracy took place before they gave their testimony (i.e., during the investigative stage of the criminal charges against him). *Id.* This court found that, based on the Supreme Court's holding in *Briscoe,* the defendants were protected by absolute immunity. *Id.* However, in that case, we explicitly noted that "the doctrine of witness immunity does not shield from liability alleged conspiracies to falsify non-testimonial evidence." *Id.* at 1174 n. 1. In *Alioto,* we did not specifically address that issue, however, because Alioto, unlike the plaintiffs here, failed to allege any facts supporting that theory. *Id.* While it is true that simply agreeing to falsify testimony, thereby form-

---

12. Satterfield also argues derivative or vicarious absolute immunity of sorts, claiming that, because Apple was absolutely immune for testimony provided at trial, Satterfield would also be immune. We reject this argument. We explicitly concluded in *Alioto* that absolute testimonial immunity "shields only those defendants who gave testimony in a judicial proceeding." *Alioto,*

835 F.2d at 1174 (concluding that summary judgment in favor of defendants who did not testify, based on the doctrine of absolute testimonial immunity, was improper). Satterfield has already been granted absolute immunity for his testimony provided at trial; he cannot now attempt to also claim the benefit of absolute immunity for defendant Apple's testimony as well.

ing a conspiracy, will not destroy absolute immunity, the above-cited cases did not discuss immunity for *non-testimonial acts,* which is the issue before us today. In those cases, the conspiracy was evidenced only by an agreement to testify falsely; for example, by the prosecutor calling a witness whom he or she knew to be fabricating testimony. *See, e.g., House,* 956 F.2d at 720–21 (noting that a person may not be prosecuted for conspiring to commit an act that he may perform with impunity, and allegations that a prosecutor called a witness whom he knew to be lying did not destroy absolute immunity).

Similarly, Satterfield garners no substantial support from *Buckley* and *Briscoe. Buckley* specifically involved absolute immunity afforded to prosecutors, and by no stretch of the imagination does Satterfield, a police officer, fit into that category. Even in *Buckley,* the Supreme Court distinguished investigative functions from prosecutorial functions in addressing whether a prosecutor should be granted absolute immunity, concluding that the latter functions, but not the former, would be entitled to such immunity.[13] *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *see also Achterhof v. Selvaggio,* 886 F.2d 826, 829 (6th Cir.1989) (pre-*Buckley* case noting that absolute immunity has been restricted to prosecutorial and judicial duties, and has not been extended to administrative or investigatory duties). In addition, in *Briscoe,* the Supreme Court re-asserted the common law rule for absolute testimonial immunity, and specifically declined to carve out an exception from this general rule for allegedly perjurious testimony by police officers.[14] *Briscoe,* 460 U.S. at 341–42, 103 S.Ct. 1108.

■ We note that absolute immunity is the exception rather than the rule, and has traditionally been reserved for those actors "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)(judges performing judicial functions); *see also Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)(same); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)(government officials engaged in adjudicative functions). Furthermore, the Supreme Court and this court have been reluctant to extend the doctrine to other officials or other situations. Indeed, the Supreme Court has explained that "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed,* 500 U.S. 478, 486–87, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Thus, the Court has been "quite sparing in [its] recognition of absolute immunity ... and ha[s] refused to extend it any further than its justification would warrant." *Id.* (internal quotations and citations omitted). Generally, courts have been substantially less willing to grant absolute immunity to law enforcement officials performing investigative duties. *See, e.g., Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("[t]he common law has never granted police officers an absolute and unqualified immunity"); *Malley v. Briggs,* 475 U.S. 335, 341–43, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)(refusing to grant absolute immunity to police officer who inappropriately sought arrest warrant).

■ The doctrine of absolute immunity for testimony is a shield to ensure that those individuals intimately involved in the judicial process are able to carry out their responsibilities without the constant threat of vexatious lawsuits, not a sword allowing them to

---

13. Satterfield also points to the Seventh Circuit's decision in *Buckley,* 20 F.3d 789, on remand to support his proposition that the alleged non-testimonial actions, standing alone, did not cause plaintiffs' to suffer any constitutional injuries. There, the court noted that the prosecutor was entitled to qualified immunity for such alleged actions as interrogating, coercing and paying witnesses, because those actions rendered no constitutional injuries. *Id.* at 794. However, Satterfield ignores the fact that the Seventh Circuit in *Buckley* also noted that concealing the

payments at trial would violate the doctrines set forth in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

14. *Briscoe* involved a factual situation similar to the present one, in which a criminal defendant asserted a § 1983 claim for damages against a police officer for giving perjured testimony at his criminal trial.

trample the statutory and constitutional rights of others. By virtue of being a witness, Satterfield is not entitled to absolute immunity in performing any nontestimonial or pre/post-testimonial acts. What plaintiffs, in essence, allege here is the fabrication of probable cause, and contrary to Satterfield's argument, the fabrication of probable cause cannot be immunized by later providing false testimony. Obviously, the two alleged acts, manufacturing false evidence and later presenting that false evidence in the form of testimony, are inextricably linked. Nonetheless, we find that adopting Satterfield's reasoning would lead to the untenable result that officials who fabricate evidence or manufacture probable cause could later shield themselves from liability simply by presenting false testimony regarding that evidence.

Plaintiffs do not allege that Satterfield and others merely presented false testimony. Indeed, they allege that something much more egregious was at work here. Specifically, that not only did Satterfield and other defendants know that Apple's testimony was false, but that they provided Apple with information regarding the Malone murder, fabricated probable cause, created a second tape recording to conceal the events of the first recording, gave Apple "hush money" after plaintiffs' first trials, and recorded and re-recorded Apple's statements. We find it incredible that Satterfield now contends that these non-testimonial acts fall within the ambit of the aforementioned absolute testimonial immunity caselaw. Considering the facts as alleged by plaintiffs, we decline to broaden the scope of absolute testimonial immunity to encompass the non-testimonial acts alleged here. We find that the district court proper-

ly granted Satterfield the only absolute immunity to which he is entitled-that for his testimony as a witness at trial-and he is clearly entitled to no more than that. Thus, we reject Satterfield's arguments here, and conclude that he is not entitled to absolute testimonial immunity for the alleged non-testimonial acts that occurred outside of the judicial proceeding.

## IV. Qualified Immunity

Having rejected Satterfield's argument that he is entitled to absolute testimonial immunity for the aforementioned non-testimonial acts, we now turn to his second and alternative argument, that he is entitled to qualified immunity for these acts. Specifically, Satterfield argues that he is entitled to qualified immunity because none of the alleged acts, standing alone, caused constitutional injuries, and that, in any event, these acts did not violate clearly established constitutional law. We disagree.

As an initial procedural matter, we note that the district court declined to determine whether Satterfield was entitled to qualified immunity, finding that he had not addressed the issue of qualified immunity with regard to the alleged non-testimonial acts. The district court, however, did review defendant Coarsey's qualified immunity argument, and concluded that solicitation of false testimony for use in prosecuting an individual violates clearly established constitutional rights.[15] On appeal, Satterfield uses that ruling to argue that the district court erred, and to establish that he would be entitled to qualified immunity.[16] After examining Satter-

---

15. In rejecting Coarsey's qualified immunity claim, the district court determined that "[s]olicitation of false testimony for use in prosecuting an individual violates clearly established constitutional rights." J.A. at 168. In so doing, the court pointed to *Geter v. Fortenberry*, 882 F.2d 167, 169 (5th Cir.1989)(police officer not entitled to qualified immunity for procuring false identification by unlawful means or for deliberately concealing exculpatory evidence) and *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir.1985)(police officer not entitled to qualified immunity for including false statements in arrest warrant affidavit).

16. Although the district court declined to address the issue of whether Satterfield was entitled to

qualified immunity, as opposed to denying his claim, we believe that remanding this case so that the district court can address this issue would be unnecessary and would simply result in protracted litigation. Moreover, we note again that we would review any district court decision regarding qualified immunity *de novo*. *See Dickerson*, 101 F.3d at 1157. In addition, Satterfield has briefed this issue, and plaintiffs contend that the district court's finding with regard to Coarsey would be equally applicable to Satterfield. Thus, as the Seventh Circuit remarked in reviewing a qualified immunity issue in *Buckley* on remand, "[t]ime would be lost, and nothing gained by these additional steps." *Buckley*, 20 F.3d at 793.

field's restated motion to dismiss, we are satisfied that he sufficiently presented the argument to the district court such that we can properly consider his claim here. *See Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)("district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' "); *English v. Dyke*, 23 F.3d 1086, 1089–90 (6th Cir.1994) (denial of a qualified immunity defense at any stage entitles a defendant to an immediate appeal). In fact, Satterfield specifically raised a qualified immunity argument in his initial and reply briefs in support of his restated motion to dismiss, both of which had been filed at the time the district court rendered its decision. *See* J.A. at 288, 422.

■■■■■ Qualified immunity, like absolute immunity, is also available as an affirmative defense that protects public officials not only from liability, but also from the "burdens of trial and discovery." *English*, 23 F.3d at 1089. *See also Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir.1996). Officials who are not entitled to absolute immunity may, in certain instances, "enjoy the protection of qualified immunity." *Achterhof*, 886 F.2d at 829. In examining a claim for qualified immunity, we must balance the need for public officials to be free from the constant fear of lawsuits brought while performing their official duties, with the recognition that "[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow*, the Supreme Court articulated the test for qualified immunity and stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727 (abandoning the subjective good faith approach to addressing qualified immunity

for the more objective reasonableness test); *see also Noble*, 87 F.3d at 161; *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994). Thus, as an initial matter, in determining whether an official is entitled to qualified immunity, we must first determine "whether, based on the applicable law, a constitutional violation occurred." *Dickerson*, 101 F.3d at 1157. If we conclude that a constitutional violation has occurred, we then determine whether this violation "involved clearly established constitutional rights of which a reasonable person would have known." *Id.* at 1158 (citation omitted); *see also Blair v. Meade*, 76 F.3d 97, 100 (6th Cir.1996); *Adams*, 31 F.3d at 386; *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988). Generally, if the right at issue was clearly established at the time the governmental actor committed the violation in question, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727. Both questions must be answered in the affirmative in order to defeat a government official's claim to qualified immunity. Additionally, the burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right. *Adams*, 31 F.3d at 386.

We conclude that, here, plaintiffs sufficiently raised claims that allege violations of their constitutional and/or statutory rights. Namely, that Satterfield and other defendants wrongfully investigated, prosecuted, convicted and incarcerated them; that Satterfield fabricated evidence and manufactured probable cause; that they were held in custody, despite a lack of probable cause to do so; and that Satterfield and others conspired to maliciously prosecute and convict them. J.A. at 113–25, 131–32 (Second Amended Complaint, Counts I and IV).[17] Satterfield cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights. *See Brady*, 373 U.S. at 83, 83 S.Ct. 1194 (State has duty

---

17. In addition, the Tennessee court held that defendants failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S.

83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Spurlock*, 874 S.W.2d at 616–18.

to disclose exculpatory evidence); *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942)(knowing use of false testimony to obtain conviction violates Fourteenth Amendment); *Mooney v. Holohan*, 294 U.S. 103, 112–13, 55 S.Ct. 340, 79 L.Ed. 791 (1935)(same); *Albright*, 510 U.S. at 274, 114 S.Ct. 807 (malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment).[18]

 Finding that the plaintiffs have sufficiently alleged violations of their constitutional rights, we next decide whether these constitutional rights were clearly established at the time in question. In so determining, we may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits. *See Dickerson*, 101 F.3d at 1158; *McBride v. Village of Michiana*, 100 F.3d 457, 460 (6th Cir.1996). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 589 (6th Cir.1994)(quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

This court, in *Smith v. Williams*, No. 94–6306, 1996 WL 99329, 78 F.3d 585 (6th Cir. Mar.6, 1996)(unpublished opinion), found that the right to be free from malicious prosecution was a right clearly established under the Fourth Amendment. *Id.* at *5. Prior to January 1994, however, this circuit analyzed that right as accruing under the Fourteenth rather than the Fourth Amendment.[19] *See id.* at **4–5 (rejecting defendant-police officer's qualified immunity claim, and holding that a reasonable police officer would have known that the alleged conduct, i.e., unconstitutionally initiating and encouraging plaintiff's criminal prosecution, was unlawful); *see also Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 340 (6th Cir.1990) (analyzing substantive due process claim for malicious prosecution); *Cale v. Johnson*, 861 F.2d 943, 949–50 (6th Cir.1988).[20]

Further, the requirement of probable cause is one of the cornerstones of Fourth Amendment protection. *See, e.g.*, U.S. CONST. Amend. IV; *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Thus, a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures. *See, e.g., Albright*, 510 U.S. at 279, 114 S.Ct. 807 (Ginsburg, J., concurring)(the "conception of a seizure and its course recognizes that the vitality of the Fourth Amendment depends upon its constant observance by police officers"). Similarly, a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would

---

18. The Fourth Amendment provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 U.S. CONST. amend. IV.

19. The right must be asserted according to the Fourth Amendment because the Supreme Court, in *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), held that there was no such substantive due process right. Justice Ginsburg, in a concurrence, noted that the Fourth Amendment would provide sufficient relief. *See Albright*, 510 U.S. at 281, 114 S.Ct. 807 (Ginsburg, J., concurring).
 Satterfield argues that *Smith* and *Albright* are inapplicable for purposes of defeating his quali-

fied immunity claim because they were decided after he committed the alleged acts. Appellant's Reply Brief at 21. We reject this argument, and point out that both of these cases relied on the fundamental principle that an individual has a constitutional right to be free from malicious prosecution, which was clearly established well before either of these cases was decided. Thus, whether the right was analyzed as accruing under the Fourth instead of the Fourteenth Amendment provides no support for Satterfield's argument on this point.

20. Other Circuits had also previously analyzed such malicious prosecution claims under the Fourth Amendment. *See, e.g., Bretz v. Kelman*, 773 F.2d 1026 (9th Cir.1985)(en banc); *Singleton v. City of New York*, 632 F.2d 185 (2d Cir.1980); *Morrison v. Jones*, 551 F.2d 939 (4th Cir.1977).

also be unlawful. We also find unpersuasive Satterfield's argument that the act was not completed, and thus no injury occurred, until the false testimony was given at trial. The injuries alleged here occurred much earlier than that point-indeed, at the very point at which Spurlock and Marshall continued to be detained, despite the lack of probable cause for such detention. Thus, Satterfield is not entitled to qualified immunity for these alleged acts, because they violated the plaintiffs' clearly established constitutional rights.

## V. Conclusion

Based on the foregoing reasons, we AFFIRM the judgment of the district court denying Satterfield's motion to dismiss based on absolute immunity. We also find that Satterfield is not entitled to qualified immunity for his alleged non-testimonial acts.[21]

21. In holding that Satterfield is not entitled to either absolute or qualified immunity, we of course express no views about the merits of plaintiffs' underlying claims against Satterfield.